[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF APPEAL
The plaintiffs, Howard Spiro and Marian Spiro, appeal from the decision of the defendant, the town of Madison zoning board of appeals, approving a variance, which was sought by the defendants, Howard Weiss and Ellen Weiss, seeking to demolish their existing legally nonconforming house and build a new nonconforming house on the property.
 BACKGROUND
The plaintiffs, Howard Spiro and Marion Spiro, are the owners of property known as 89 Middle Beach Road, Madison, Connecticut. (Appeal, ¶ 1.) The defendants, Howard Weiss and Ellen Weiss, are the owners of property known as 87 Middle Beach Road, Madison, Connecticut. (Appeal, ¶¶ 3, 16; ROR, 5. d.) On April 4, 2001, the Weisses submitted to the Madison zoning board of appeals an application for a variance with a coastal site plan review seeking permission to demolish their existing nonconforming house and to build a new house. (Appeal, ¶ 4.) The Weisses' home is legally nonconforming because is predates the zoning requirements in that area and it is located on an undersized lot with CT Page 9282 less than the minimum setbacks for that zone, which is an R-2 residential zone. (ROR, Doc. 1, pp. 4-5, 11; Doc. 5. d; Doc. 6, §§ 1.1, 3.6.) The home also exceeds the maximum lot coverage and is located in a flood zone. (ROR, Doc. 1, p. 11.)
A public hearing was held on June 5, 2001, after which the board voted to deny the variance sought by the applicants by a vote of four to one. (Appeal, ¶¶ 6-7.)
On July 13, 2001, the Weisses submitted a revised second application and coastal site plan review to the board. (Appeal, ¶ 10.) A public hearing on the second application was held on August 7, 2001. (Appeal, ¶ 12; ROR, Doc. 1, p. 2.) At the hearing, the Weisses sought to vary §§ 3.6(d) and (f)[1] of the Madison zoning regulations "to allow 25.91 percent area coverage and 10.5 foot front yard and 18 foot east side yard and 18 foot west side yard variances to permit house and garage to be demolished and rebuilt on same footprints." (ROR, Doc. 1, pp. 4-5.) The Weisses' architect, Peter Springsteel, stated that he would like I to rectify building code and flood regulation deficiencies that currently exist with the house and rebuild the house so that it will be "a modem replica of the original house." (ROR, Doc. 1, p. 8.)
After the close of the hearing, the board voted to approve the variance sought by the applicants by a vote of four to one. (Appeal, ¶ 13, ROR, Doc. 2, p. 339.) As its reason for approving the variance, the board stated that the changes would be "[un keeping with the neighborhood with a non-conforming, pre-existing lot." (ROR, Doc. 1, pp. 84-85; Doc. 2, p. 339.) Notice of the board's decision was published on August 15, 2001. (Appeal, ¶ 14; ROR, Doc. 4.)
 JURISDICTION
General Statutes § 8-8 governs an appeal from a decision of a planning and zoning commission to the Superior Court. "A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created." (Internal quotation marks omitted.) Bridgeport Bowl-O-Rama v. Zoning Board of Appeals, 195 Conn. 276,283, 487 A.2d 559 (1985).
Aggrievement
"[P]leading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of a plaintiff's appeal."Jolly, Inc. v. Zoning Board of Appeals, 237 Conn. 184, 192, 676 A.2d 831
(1996). General Statutes § 8-8 (a)(1) provides, in pertinent part, that an aggrieved person includes "any person owning land that abuts or CT Page 9283 is within a radius of one hundred feet of any portion of the land involved in the decision of the board." The Spiros allege that they are aggrieved by the decision of the board because they own and occupy property abutting the subject matter property.
The Spiros have attached two quit-claim deeds, dated December 13, 2000, and February 14, 2001, pursuant to which Marion W. Spiro, for consideration, granted to Howard M. Spiro and Marshall D. Gibson, as trustees, an undivided one-half interest in the 89 Middle Beach Road property. (ROR, Deed, Plaintiffs' Exhibits A, B.) "The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision. . . . Aggrievement 15 established, if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. . . ." (Brackets in original; citations omitted; internal quotation marks omitted.) Harris v. Zoning Commission, 259 Conn. 402,410, 788 A.2d 1239 (2002). The Spiros have established that as abutting owner and trustee, respectively, they are personally and legally aggrieved, and, at the April 16, 2002 trial, the court found that the Spiros were aggrieved.
Timeliness and Service of Process
General Statutes § 8-8 (b) provides, in pertinent part, that an "appeal shall be commenced by service of process in accordance with subsections (e) and (t), [now subsections (f) and (g)], of this section within fifteen days from the date that notice of the decision was published as required by the general statutes." Service of process "shall be made by leaving a true and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality." General Statutes § 8-8 (e), [now subsection (f)]. "Service of process shall also be made on each person who petitioned the board in the proceeding, provided his legal rights, duties or privileges were determined therein." General Statutes § 8-8 (f), [now subsection (g)].
The record contains evidence that notice of the board's decision was published on August 15, 2001. (Appeal, ¶ 14; ROR, Doc. 4.) On August 30, 2001, this appeal was commenced by service of process on the chairman CT Page 9284 of the town of Madison zoning board of appeals, the clerk of the town of Madison, and the defendants, Howard Weiss and Ellen Weiss. Accordingly, the court finds that the appeal was timely and served upon the appropriate parties.
 SCOPE OF REVIEW
"The standard of review on appeal from a zoning board's decision to grant or deny a variance is well established. . . . Courts are not to substitute their judgment for that of the board . . . and decisions of local boards will not be disturbed so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . Upon appeal, the trial court reviews the record before the board to determine whether it has acted fairly or with proper motives or upon valid reasons . . . . The burden of proof to demonstrate that the board acted improperly is upon the plaintiffs . . . .
"A variance constitutes permission to act in a manner that is otherwise prohibited under the zoning law of the town." (Citations omitted; internal quotation marks omitted.) Bloom v. Zoning Board of Appeals, 233 Conn. 198,205-06, 658 A.2d 559 (1995).
"An applicant for a variance must show that, because of some peculiar characteristic of his property, the strict application of the zoning regulation produces an unusual hardship, as opposed to the general impact which the regulation has on other properties in the zone." (Internal quotation marks omitted.) Reid v. Zoning Board of Appeals, 235 Conn. 850,857, 670 A.2d 1271 (1996).
"Where a zoning agency has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the [board] was required to apply under the zoning regulations." (Brackets in original; internal quotation marks omitted.)RR Pool Patio, Inc. v. Zoning Board of Appeals, 257 Conn. 456, 470,778 A.2d 61 (2001).
 DISCUSSION
A. Whether the Board Properly Granted The Weisses' Variance Application.
The Spiros claim that the board exceeded its authority in granting the Weisses a variance because the Weisses' hardship was self-created and voluntarily assumed. According to the Spiros, a board may not grant a variance based on hardship unless the hardship arises from circumstances beyond the applicant's control, and self-created hardship is not a basis CT Page 9285 upon which a variance may be granted because self-created hardship arises from the individual's personal preferences.
The Spiros argue that one type of voluntarily assumed hardship is known as "the purchase with knowledge rule." The Spiros assert that under the rule, if a purchaser buys property with knowledge of the applicable zoning regulations and then attempts to use the property in a manner proscribed by those regulations, the purchaser may not be granted a variance. The Spiros claim that the Weisses purchased the subject property in 1992 knowing that, pursuant to Madison zoning regulations, the house was legally nonconforming. The Spiros argue that because the Weisses purchased their property with knowledge of the applicable regulations, and because they are now seeking a variance despite having purchased the property knowing of its prohibitions, their hardship is self-created and, accordingly, the board is proscribed from granting them a variance.
In addition, the Spiros argue that in order to avoid a finding of self-created hardship, an applicant must show that because of an unusual characteristic of his or her property, the strict application of the zoning regulations to the property produces an unusual hardship. The Spiros argue that the Weisses have not been able to establish unusual hardship because their sole allegation of hardship is that Madison's existing setback and building coverage restrictions render their lot unbuildable, so that their claimed hardship will only occur if they demolish their existing house. The Spiros claim that the Weisses now live in a "charming" structure which is worth "$400,000," and that the Weisses' allegation of hardship does not rise to the level of hardship which is required to support the grant of a variance.
The Weisses counter that their hardship is not self-created because a review of the record reveals that their hardship does not arise from any action on their part; rather, the hardship arises from zoning regulations which were enacted after the subject house was built, which imposed requirements, "such as coverage and minimum yards," with which the property did not conform at the time the regulations were enacted.
The Weisses maintain that their hardship lies in the fact that they have a small size lot, so that anything done on the lot would require a variance. The Weisses further contend that, prior to purchasing the house in 1992, the property had been issued a winterization permit and a health department discharge permit for the purpose of winterization. In 1990, a new septic system was installed which was compliant for a three bedroom home. The Weisses claim that winterization would require compliance with flood zone regulations, which require the house to be raised approximately one and one-half feet. In addition, winterization would CT Page 9286 require extensive work to the house, and any remodeling costing more than one-half the value of the house requires that the Weisses bring the house up to code, which, in turn, would require extensive work to the house. They claim that their hardship derives from the application of the ordinances and building regulations to the property and that it is not a self-created hardship.
The record reflects that at its August 7, 2001 public hearing, the board entertained statements both in opposition to and in support of the variance. For example, counsel for the Spiros stated that the only hardship experienced by the applicants is that they want a new and different house. (ROR, Doc. 1, p. 27.) The Spiros' counsel also said that because the Weisses purchased the house with a winterization permit, it was their responsibility to winterize the house when they purchased it, and their current desire for a larger, winterized house does not rise to the level of legal hardship. (ROR, Doc. 1, pp. 31-32.) He further stated that a perfectly charming and valuable house now stands on the lot and that the lot only becomes unbuildable if the existing house is torn down. (ROR, Doc. 1, p. 32.)
The board read into evidence seventeen letters from neighbors who were, for the most part, concerned about losing their view, concerned that the size of the lot prevented changes from being made, and concerned that the new residence would alter the character of the neighborhood and would destroy a charming landmark. (ROR, Doc. 1, pp. 47-51.)
In support of the variance, the board heard from Peter Springsteel, the Weisses' architect, who explained that the Weisses' hardship lies in the fact that they have a preexisting nonconforming lot which is only forty feet wide and only contains 5,920 square feet. (ROR, Doc. 1, p. 11.) Springsteel said that the requirement in the zone is for a 40,000 square foot lot with 120 foot width. (ROR, Doc. 1, p. 11.) According to Springsteel, the 20 foot setbacks on the existing lot meet in the center of the lot, making the lot completely unbuildable if there were no structure on it. (ROR, Doc. 1, p. 11.) According to Springsteel, any work done on the present structure would require a variance. (ROR, Doc. 1, p. 11.)
Springsteel explained that the property was purchased with a winterization permit, and that the cost of winterizing the property would exceed fifty percent of the value of the structure. (ROR, Doc. 1, p. 11.) Springsteel stated that once you trigger the so-called "50% rule," flood regulations must be met; (ROR, Doc. 1, p. 46; Doc. 6, § 2A.1.1); which means that the house must be lifted. (ROR, Doc. 1, pp. 11-12.) According to Springsteel, the present structure could "come apart" in a storm and could be a hazard to the surrounding structures. (ROR, Doc. 1, CT Page 9287 p. 12.) He also pointed out that a heating system cannot be installed in the house without first meeting flood zone requirements. (ROR, Doc. 1, p. 13.)
Springsteel further stated that the present structure does not conform to building codes because of a nonconforming stairway and landings and that the Weisses would like to bring the house into compliance with building codes. (ROR, Doc. 1, p. 12.) Finally, Springsteel stated that the Weisses would attempt to duplicate and replicate the character of the house so that it will be "a close facsimile of what it was architecturally." (ROR, Doc. 1, p. 13.)
Counsel for the Weisses emphasized that the new house would be in character with the neighborhood and "look more like the original than any other house." (ROR, Doc. 1, pp. 59-60.) Mr. Weiss commented that tearing down the structure and rebuilding it would be less of a disruption to the neighbors than renovating the home. (ROR, Doc. 1, p. 54.)
After the public portion of the hearing closed, board members commented that the Weisses appeared to have taken the concerns of their neighbors and the board into account with their second application. (ROR, Doc. 1, p. 68.) One board member observed that the Weisses have to raise the house to comply with the coastal site plan and the house requires renovations. (ROR, Doc. 1, p. 74.) Another board member agreed with the Weisses that there may be more of an impact on the neighbors if the house was to be repaired than if the house was torn down and rebuilt. (ROR, Doc., 1 p. 74.) The board's chairperson questioned whether the hardship lies in the fact that the Weisses were rebuilding on an existing lot, which is really too narrow for a conforming structure anywhere on the lot. (Doc. 1, p. 78.) A board member responded that "it was as classic a hardship case" as he'd ever seen because of the Weisses' desire to conform to code with a property as narrow as their property was. (ROR, Doc. 1, pp. 78-79.) This member also pointed out that because the Weisses had a right to live in the house year-round, they have to make some changes, and the changes they have submitted are appropriate. (ROR, Doc. 1, p. 80.)
The board concluded the hearing by voting to grant the variance because the variance would allow the house to be "in keeping with the neighborhood with a non-conforming, preexisting lot." (ROR, Doc. 1, p. 84-85; Doc. 2, p. 339.)
"One specific type of voluntarily assumed hardship is embodied in what has been termed `the purchase with knowledge rule.' R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (2d Ed. 1999) § 9.4, p. 190. Under that rule, if a purchaser acquires property with knowledge of the applicable zoning regulations . . . and later attempts CT Page 9288 to use that property in a manner that is proscribed by the regulations, the purchaser is barred from obtaining a variance." Kalimian v. ZoningBoard of Appeals, 65 Conn. App. 628, 632, 783 A.2d 506, cert. denied,258 Conn. 936, 785 A.2d 231 (2001). In Abel v. Zoning Board of Appeals,172 Conn. 286, 289-91, 374 A.2d 227 (1977), where an applicant purchased property knowing that zoning regulations required that the property be maintained as a park reserve, and that pursuant to the regulations, the lot was too small for a house, the Connecticut Supreme Court found that the applicant's hardship was self-created because he was aware, when he purchased the property, that the applicable zoning regulations prevented him from constructing a residence on the property.
The Connecticut Supreme Court, in Johnny Cake, Inc. v. Zoning Board ofAppeals, 180 Conn. 296, 300, 429 A.2d 883 (1980), has emphasized, however, that the rule of Abel does not apply where a hardship is created by the enactment of a zoning ordinance. "[I]f the hardship is created by the enactment of a zoning ordinance and the owner of the parcel could have sought a variance, then the purchaser has the same right to seek a variance and, if his request is supported in law, to obtain the variance . . . . Otherwise the zoning ordinance could be unjust and confiscatory." (Citation omitted.) Id., 300-01. "We have stated that there has always existed a distinction between circumstances such as those in [Abel], where the applicant or his predecessor in interest creates a hardship such as an undersized lot, and a situation where the hardship which would justify the grant of a variance originates in the zoning ordinance itself." (Brackets in original; internal quotation marks omitted.)Adolphson v. Zoning Board of Appeals, 205 Conn. 703, 712, 535 A.2d 799
(1988).
The present case is analogous to the facts in O'Neill v. Zoning Boardof Appeals, Superior Court, judicial district of New Haven, Docket No. 417142 (March 11, 1999, Blue, J.) (24 Conn.L.Rptr. 176), where the subject lot was narrow and irregularly shaped. The property owner had demolished the house, in order to rebuild it, before applying for a variance. Id., 176. The issue was whether the board could grant a variance to rebuild a house on the property, if, absent a variance, no conforming dwelling could be built on the property. Id. The court held that "because the property [could] not be put to any residential use absent a variance," the record supported the board's finding of a hardship. Id. The court emphasized that the problem was that, "given the irregular shape of the property, the property could not be put to anyconforming use absent a variance . . . ." (Emphasis in original.) Id., 177. Similarly, in Stillman v. Zoning Board of Appeals, 25 Conn. App. 631,636-37, 596 A.2d 1, cert. denied, 220 Conn. 923, 598 A.2d 365 (1991), where an applicant sought a variance to build an addition on her legally nonconforming lot, the Appellate Court found that the applicant's CT Page 9289 hardship was not self-created, but arose from the size of the lot and the location of the well and the septic system.
In the present case, there is adequate evidence on the record for the court to find that the Weisses' hardship is not self-created but arises from the enactment of a zoning ordinance affecting their property. In addition, evidence on the record indicates that because of the size of the lot, no conforming structure can be built without a variance. Evidence on the record also indicates that because the applicants purchased the property with a winterization permit, and they are entitled to winterize the house in order to use it year round, they must bring the house into compliance with building codes and flood zone regulations and evidence from the record demonstrates that this would be extremely impractical to do without demolishing the original structure and building a new one. Finally, evidence from the record indicates that in terms of the character of the house, the Weisses would be building an almost identical residence in a residential neighborhood.
"[W]e have interpreted General Statutes . . . § 8-6 to authorize a zoning board of appeals to grant a variance only when two basic requirements are satisfied: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan. . . . Proof of exceptional difficulty or unusual hardship is absolutely necessary as a condition precedent to the granting of a variance." (Citation omitted; internal quotation marks omitted.) Bloomv. Zoning Board of Appeals, supra, 233 Conn. 207.
The record supports a finding that the Weisses met their burden of showing that their hardship was unusual and that it was not self-created. In making its determination, the record reflects that the board properly granted the variance application because the Weisses met the two-part test of General Statutes § 8-6 (a)(3)[2] in that the record reflects that the board recognized that the residence would be built in a R-2 residential neighborhood, so that the comprehensive plan would not be affected;[3] (ROR, Doc. 1, p. 5; Doc. 2, p. 337; Doc. 5. f., Map.); and the record revealed that the board recognized that adherence to the strict letter of the zoning ordinances would cause the Weisses unusual difficulties. See Bloom v. Zoning Board of Appeals, supra, 233 Conn. 207. Accordingly, the Weisses established hardship that was not self-created and that the board properly granted them a variance based on hardship.
B. Whether the Board Acted Arbitrarily and Capriciously By Approvingthe Enlargement of a Nonconformity. CT Page 9290
The Spiros next assert that the board exceeded its authority when it approved the enlargement of a nonconformity. The Spiros argue that the Weisses' property is governed by § 12.6 of the Madison zoning regulations, which provides: "No building which does not conform to the requirements of these regulations regarding the building height limit, area and width of lot, percentage of lot coverage, and required yards and parking facilities shall be enlarged unless such enlarged portion conforms to the regulations applying to the district in which it is located." (ROR, Doc. 6, § 12.6.)
The Spiros argue that the proposed structure is governed by this section because the proposed structure would violate the restrictions of § 12.6 and, thus, fail to conform to the regulations. According to the Spiros, in order to obtain the required approval from the board, the Weisses should have applied for a variance of § 12.6 of the Madison zoning regulations. In addition, the Spiros argue that the new conformity will also increase the existing nonconformity because of (1) the construction of air conditioning unit pads on the back of the house on land that is currently conforming and (2) the extension of front steps and landing farther into the front setback. The Spiros also claim that the new structure would constitute an impermissible enlargement because of the vertical expansion of the second floor.
The Weisses counter that the Spiros mistakenly rely on § 12.6 of the regulations because that section applies to the enlargement of an existing structure and not to a situation, such as the present situation, in which the existing structure will be torn down and rebuilt. The Weisses claim that the maximum coverage of the new structure will remain the same as for the old structure, at 25.91 percent, the side yard setbacks will remain the same, and that the only increase in terms of setback will be in the front yard setback, which will go from thirty-five feet to twenty-nine feet six inches because front steps must be added to the house since the house must be raised one and one-half feet in order to comply with flood zone regulations. They argue that the Spiros incorrectly claim that the nonconformity is increased by the air conditioning pads and the front steps because existing coverage will be maintained by detaching the garage from the house and the extension of the front steps is not considered in calculating coverage. (ROR, Doc. 6, § 2.8.1.) The Weisses also claim that they can only build a new house within the existing footprint because building the house further into the back yard setback would place the new house over the existing septic system. (ROR, Doc. 5.1.)
In addition, the Weisses claim that the Spiros mischaracterize the nature of the vertical expansion when they assert that the house would CT Page 9291 impermissibly expand vertically. In the present case, the Weisses argue that they are not adding a new floor, they are only adding ceiling height to the existing second floor because they are required to do so by building code regulations. They point out that even after raising the ceiling height, they will still be within the regulations for a maximum height allowance of twenty-four feet. (ROR, Doc. 6, § 2.7.1.)
As previously stated, the record reflects that the board heard testimony for and against the proposed variance during the public hearing. Specifically referring to the vertical increase in the size of the proposed house, counsel for the Spiros stated that his clients, as well as the neighbors, were concerned that the new construction would increase the roof ridge of the present structure from twenty-one feet nine inches to twenty-eight feet three inches, adding to the height of the house. (ROR, Doc. 1, p. 29.) He pointed out that such a ridge height would be too tall for such a narrow lot. (ROR, Doc. 1, p. 31.) Counsel also stated that the house did not need to be demolished and rebuilt in order to comply with flood zone regulations, it could be raised. (ROR, Doc. 1, p. 31.) He concluded by stating that the Weisses were seeking to expand the house horizontally, because they would be installing air conditioning pads in the rear of the house and steps to the front of the house, and, vertically, because they would be adding roof height to the house. (ROR, Doc. 1, pp. 37-38.) Therefore, the nonconforming structure would be expanding horizontally and vertically and the Weisses had not sufficiently established legal hardship to show they could make those changes. (ROR, Doc. 1, pp. 38.)
Springsteel stated that the Weisses were not seeking to decrease existing setbacks, they were seeking to raise the building, and were seeking a variance to expand the bulk of the building. (ROR, Doc. 1, pp. 8-9.) He said that they sought to add an uncovered landing and stairway that would reduce the front yard setback from thirty-five feet to twenty-nine feet six inches, where the required front yard setback is forty feet. (ROR, Doc. 1., p. 9.) He pointed out that after making the changes, the present building coverage would remain at 25.91 percent and that the required coverage is ten percent. (ROR, Doc. 1, p. 9.) He added that air conditioning units would be added to the back of the house but that this would not increase the overall coverage of the house because the connection between the garage and the house would be eliminated. (ROR, Doc. 1, pp. 9-10.) He proposed installing a pitched roof to the house, to solve leak problems, and adding height to a bedroom on the second floor to bring the ceiling height in the bedroom up to code. (ROR, Doc. 1, p. 15.) He said that in order to meet flood zone regulations, the house would have to be raised a foot and a half, from an elevation of eleven and a half feet to an elevation of thirteen feet. (ROR, Doc. 1, p. 15.) Springsteel also stated that the Weisses were not CT Page 9292 seeking to add variances for height, because the proposed height of the new structure would be twenty-three feet eleven inches, which falls within the twenty-four foot maximum height for a forty foot wide lot. (ROR, Doc. 1, p. 10.) He proposed tearing down the garage and rebuilding it to the exact dimension, at the same location, in order to address wood rot and in order to install a proper foundation for the garage. (ROR, Doc. 1, p. 10.)
A neighbor spoke to say that he was unhappy with the proposed bulk in the back of the house and he thought that the leaking roof could be fixed without bringing the house two feet from his property line. (ROR, Doc. 1, p. 43.) The board read a neighbor's letter into the record objecting to the additional setback and encroachments. (ROR, Doc. 1, p. 49.) In other letters, which the board read into the record, neighbors objected to the size of the proposed house because of the small lot. (ROR, Doc. 1, pp. 50-51.) The Spiros, in a letter, objected to the height, the setbacks, and the proximity of the structure to their home. (ROR, Doc. 1, p. 51.)
After the close of the public portion of the hearing, a board member expressed concern with the "overwhelming aspect" of the second floor. (ROR, Doc. 1, p. 69.) A board member commented that the board would never approve the building of a garage so close to a neighbor's property. (ROR, Doc. 1, p. 69.) A board member noted that the lot coverage would not be changing with the proposed structure, the house must be raised to comply with coastal site plan, and renovations needed to be done. (ROR, Doc. 1, p. 73-74.) One board member was concerned that, in their new proposal, the Weisses did not seek to minimize the existing nonconformity. (ROR, Doc. 1, p. 77.) Another member responded to this point by stating that the neighbors were not opposing the nonconformity, they were opposing the increased height of the new structure. (ROR, Doc. 1, p. 77.) As previously stated, following their discussion, the board voted to approve the variance by a vote of four to one, stating as its reason that the variance would allow the house to be "in keeping with the neighborhood with a non-conforming, pre-existing lot." (ROR, Doc. 1, p. 85; Doc. 2, p. 339.)
Connecticut courts have found that minor extensions of nonconforming uses are acceptable. For example, in Linville v. Zoning Board ofAppeals, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV980168517 (August 1, 2000, Rodriguez, J.), the issue was whether the board had abused its discretion in allowing increases in the already existing nonconformities where the defendants were seeking to demolish and reconstruct their home and a hardship was found because of the size and shape of the subject lot. The defendants, in reconstructing the house, were seeking variances for an expansion of CT Page 9293 the already legally nonconforming setbacks. Id. In reviewing the pertinent provisions of the Norwalk building zone regulations, the court found that the regulations revealed that "`[a] nonconforming structure shall not be enlarged or altered if the result would be an increase in the extent to which the structure does not conform to these regulations. A nonconforming structure may be enlarged or altered, provided that the enlargement or alteration conforms to these regulations." Id., quoting Norwalk Building Regulations § 118-800(D)(1). In addition, the court found that, pursuant to the regulations, the board had the authority to vary any requirement of the regulations "`in harmony with their general purpose and intent, so that substantial justice may be done.'" Linville v. Zoning Board of Appeals, supra, Superior Court, Docket No. CV980168517, quoting Norwalk Building Regulations § 118-1410(3). "`[T]he zoning board of appeals is statutorily authorized to vary the terms of any zoning regulation as long as the board acts consistently with variance-granting principles. . . . This appears to allow the board of appeals to authorize, through the granting of a variance, an owner to ignore a regulation prohibiting extension of a nonconforming use.'" (Emphasis in original.) Linville v. Zoning Board ofAppeals, supra, Superior Court, Docket No. CV980168517, quoting T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) § 3.E.3., p. 164.
In Cirullo v. Zoning Board of Appeals, Superior Court, judicial district of New London, Docket No. 533659 (November 22, 1996, Hurley,J.T.R.) (18 Conn.L.Rptr. 309), the plaintiffs, who owned nonconforming property, sought to change the gable dormer on the second floor of their house to a shed dormer, in order to comply with town regulations for ceiling height. The court characterized the proposed change as an "intensification" of the nonconforming use, rather than an "unlawful expansion" of that use. Id., 312. The court concluded that the plaintiffs did not "propose to extend the nonconformity of their home in any meaningful way," therefore, their "proposed renovation [did] not represent an unlawful extension or expansion of a nonconforming use." Id., 313.
Although the Spiros quote § 12.6 of the Madison zoning regulations for the proposition that the regulations prohibit the enlargement of a nonconforming structure, § 12.1 of the Madison zoning regulations provides, in pertinent part, that with the approval of the Madison zoning board of appeals, a non-conforming use may be changed "to another nonconforming use no more objectionable in character." (ROR, Doc. 6, § 12.1.) Section 13.3.3 of the Madison zoning regulations also provides that the zoning board of appeals shall have the power and duty to "determine and vary the application of provisions of these regulations in harmony with their general purpose and intent and with due consideration CT Page 9294 for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land, where owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of these regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and public safety and welfare secured." (ROR, Doc. 6, § 13.3.3.)
In the present case, the enlargement of the existing nonconformity is minimal, limited to adding air conditioning pads in the rear of the house and five feet and six inches of steps to the front of the house. Furthermore, evidence from the record demonstrates that the front setback variation is needed because the Weisses are seeking to comply with flood zone regulations and because the proposed house cannot be built further into the rear setback without extending over the existing septic system. Evidence from the record indicates that despite changes in the front and rear setback as a result of the proposed additions, coverage of the new house will remain at 25.9 percent. Vertically, even though the height of the house will be increased by approximately seven feet, the height of the house will not exceed maximum height coverage allowed by the regulations, so that a variance for vertical expansion is not required. For the purposes of approving an expansion of the current legal nonconforming use of the house, evidence from the record demonstrates that in terms of size and character, the Weisses are tearing down and rebuilding virtually the same house on their property, with the exception that there will be additional front steps in the front of the house and air conditioning pads at the back of the house.
Accordingly, because (1) the record reflects that an unusual hardship, which is not self-created, exists with respect to the Weisses' property, and (2) the record reflects that the Weisses do not propose to enlarge the nonconformity "in any meaningful way"; Cirullo v. Zoning Board ofAppeals, supra, Superior Court, Docket No. 533659; and (3) the expansion of the nonconformity is the result of their attempt to comply with building code regulations and flood zone regulations; and (4) § 12.1 of the Madison zoning regulations allows the board to "approve another non-conforming use no more objectionable in character," and § 13.3.3 of the Madison zoning regulations authorizes the board of appeals to "vary" the application of the regulations where "a literal enforcement of [the] regulations would result in exceptional difficulty or unusual hardship," the court finds that the board's decision to grant the variance and allow for the enlargement of the nonconformity was reasonably supported by the record.
C. Whether the Board Improperly Considered the Second Application inViolation of General Statutes § 8-6 (a). CT Page 9295
The Spiros finally argue that the board violated § 8-6 (a) when it considered the second application less than six months after the denial of the first application.
The Weisses counter that the plain meaning of the statute indicates that the board "cannot be forced to hear the same or substantially the same application within the six month window." (Defendants' Memorandum, p. 15.) They argue that their second application was not the same application as their first one because in their second application they "deleted a second story addition over the utility room and removed a peak roof," and they limited their extension of the second floor to what was needed in order to bring the building up to code. (Defendants' Memorandum, p. 15.)
"In considering a subsequent variance application where it has already denied a similar prior one, a zoning board of appeals is generally precluded from reversing a prior decision unless there has been a material change of conditions, or other considerations have intervened affecting the merits, and no vested rights have arisen." (Internal quotation marks omitted.) Grasso v. Zoning Board of Appeals, 69 Conn. App. 230, 244-45,794 A.2d 1016 (2002). Section 8-6 (a)(3) provides, in pertinent part, that "[n]o . . . board shall be required to hear any application for the same variance or substantially the same variance for a period of six months after a decision by the board or by a court on an earlier such application."
As previously stated, a public hearing was heard on the first application on June 5, 2001. A public hearing was heard on the second application on August 7, 2001, two months after the first public hearing. The record demonstrates that the board recognized that with their second application, the Weisses had taken the concerns of their neighbors and the board into account and had revised their application accordingly. (ROR, Doc. 1, pp. 68-69, 79; Minutes, p. 6, Plaintiffs Exhibit B.) The court finds therefore, that evidence from the record reflects that the Weisses' second application for a variance was not "substantially the same" as their first application. Id.
Accordingly, the court finds that the board properly considered the Weisses' second application.
For the foregoing reasons, the court dismisses the appeal.
_____________________ Robert P. Burns Judge Trial Referee CT Page 9296